**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

IN RE: NEW YORK COMMUNITY       **MEMORANDUM OF**
BANCORP, INC., SECURITIES         **DECISION AND ORDER**
LITIGATION                      04-CV-4165 (ADS)(AKT)

---------------------------------------------------------X

<u>**A P P E A R A N C E S:**</u>

**MILBERG WEISS BERSHAD & SCHULMAN LLP**
Lead attorneys for the plaintiffs
One Pennsylvania Plaza
New York, NY 10119
        By:    Barry A Weprin, Esq.,
                Sharon Maine Lee, Esq., and
                Arvind Khurana, Esq., of Counsel

**MURRAY FRANK & SAILER LLP**
Attorneys for the plaintiff Neil Mulligan
275 Madison Avenue
New York, NY 10116
        By:    Marvin L. Frank, Esq.,
                Lawrence D. McCabe, and
                Eric J. Belfi, Esq., of Counsel

**STULL, STULL & BRODY**
Co-counsel for the plaintiffs Al Tawil and Estate of Farah Mahlab
6 East 45th Street
New York, NY 10017
        By:    Aaron L. Brody, Esq., and
                Howard T. Longman, Esq., of Counsel

**KANTROWITZ GOLDHAMER & GRAIFMAN, P.C.**
Co-counsel for the plaintiffs Al Tawil and Estate of Farah Mahlab
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977
        By:    Gary S. Graifman, Esq., of Counsel

**SULLIVAN & CROMWELL LLP**
Attorneys for the defendants
125 Broad Street
New York, NY 10004-2948
   By: Brian Thomas Frawley, Esq., and
      Michael H. Rosner, Esq., of Counsel

**SPATT, District Judge.**

   In this consolidated class action the plaintiffs claim that the defendants New

York Community Bancorp. ("NYCB"), and Joseph R. Ficalora, Joseph L. Mancino,

Michael F. Manzulli, Michael Puorro, Robert Wann, Anthony E. Burke, James J.

O'Donovan, Thomas R. Cangemi (collectively with NYCB, the "Defendants"),

violated federal securities laws by making materially false and misleading statements

concerning NYCB's investment practices; its exposure to interest rate risk; the

composition of its investment portfolio; and its ability to sustain growth through its

multi-family mortgage lending business.  Currently before the Court is (1) a motion by

the plaintiffs Al Tawil and Estate of Farah Mahlab (collectively the "Tawil Plaintiffs")

to vacate the Court's previous order of consolidation; and (2) a motion by the

Defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.

R. Civ. P.") to dismiss the Consolidated and Amended Class Action Complaint.

# I.  BACKGROUND

**A.      Procedural History**

By order dated August 9, 2005 ("Consolidation Order"), United States District Judge Denis R. Hurley consolidated eleven related purported securities class actions commenced on behalf of investors who purchased or acquired stock of NYCB.  In addition, the Court appointed Metzler Investment GmbH and Bernard Drucker (collectively the "NYCB Group") as Lead Plaintiff and its counsel Milberg Weiss Bershad & Schulman LLP as lead counsel.  On October 6, 2005, the Lead Plaintiffs filed a Consolidated and Amended Class Action Complaint ("Complaint").  On February 24, 2006, the Defendants timely filed the pending motion to dismiss the Amended Complaint.  On March 10, 2006, the case was reassigned to this Court.  On April 12, 2006, the Tawil Plaintiffs filed the pending motion for reconsideration and to vacate the Order of Consolidation.

**B.      The Consolidated and Amended Class Action Complaint**

The Complaint seeks relief under the Securities and Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act") for all persons who purchased or acquired NYCB securities between June 27, 2003, and July 1, 2004 (the "Class Period").  In addition to existing shareholders of NYCB, the Class Period includes holders of Roslyn Bancorp, Inc. ("Roslyn") common stock who acquired shares of NYCB common stock in connection with the merger of Roslyn and NYCB

on October 29, 2003, and those who purchased NYCB common stock in connection with a secondary public offering completed by NYCB in January 2004 (the January 2004 offering").

According to the Complaint, NYCB is a thrift engaged primarily in retail banking, the production of multi-family and residential construction loans, and in the sale of third-party investment products and financial services. Beginning in November 2000 NYCB achieved significant growth earning targets, in large part due to its acquisitions of other financial institutions, including Haven Bancorp., Inc., Richmond County Financial Corp., and finally Roslyn. NYCB built a unique and profitable core lending business comprised of multi-family mortgage loans.

The proposed merger with Roslyn was announced on June 27, 2003. The merger agreement provided that Roslyn shareholders would receive .75 shares of NYCB stock for each outstanding share of Roslyn stock. On September 23, 2003, Roslyn and NYCB issued a Joint Proxy (the "Joint Proxy") soliciting votes in favor of the merger, and the issuance of stock to fund the merger. In connection with the merger, NYCB announced that it intended to restructure Roslyn's balance sheet through the sale of as much as 3.5 billion in securities. At the time of the merger announcement, the two companies reported that Roslyn and NYCB had "exact opposite" balance sheets with regard to assets and liabilities, and the restructuring was

designed to "restore the mix of assets to its pre-merger configuration." Compl. ¶¶ 71, 95. The merger was completed on October 29, 2003.

By November 2003, the three newly acquired institutions merged into NYCB accounted for $17 billion of its $23.4 billion in assets, and $11 billion of its $12.1 billion in deposits. Compl. ¶ 58. Through these transactions NYCB grew significantly, including immediate accretions to earnings, increased deposits, increased fee income and increases in lending activity. However, it is claimed in the Complaint that these mergers did not provide significant longer term earnings growth opportunities for NYCB's core business of multi-family lending.

Despite NYCB's growth, in 2003 the company's niche in multi-family lending faced uncertainty due to rising interest rates and increased competition from national lenders such as Fannie Mae and Washington Mutual. In order to remain competitive in the lending market, NYCB lowered its interest rates, and offered less profitable terms that were comparable to its competitors. As a result, NYCB's yields on its multi-family loans declined and NYCB's ability to grow its core earnings was allegedly limited.

The thrust of the 137 page complaint centers on NYCB's involvement in a risky, but common, leveraging strategy involving mortgage-backed securities known as the "carry trade." The carry trade involves financing or "carrying" the purchase of mortgage-backed securities with funds borrowed through repurchase agreements from

the money market.  This strategy attempts to take advantage of the differences between the rates of repurchase agreements, which have lower short-term interest rates, and the mortgage-backed securities, which have higher long-term interest rates. A comparison of the differences between the rates is called the "yield curve."  Relying on this mismatch of interest rates can produce significant gains when the yield curve is steep, that is, when the spread between long-term and short-term interest rates is wide. This investment strategy was, according to the Complaint, allegedly utilized by NYCB to offset the undisclosed limited growth in its core lending business.

However, the carry trade has its risks.  If the yield curve flattens because short-term interest rates increase and long-term rates do not increase at a similar pace, the investment is exposed in two ways.  First, the spread between the interest rates  is reduced such that net income from the spread decreases, an event known as a "margin squeeze."  Second, under applicable accounting rules, mortgage-backed securities are classified as "available-for sale," instead of "held to maturity," and thus the investor must immediately realize any loss on the decline in value of the securities. Accordingly, the more money NYCB borrowed to purchase mortgage-backed securities, the more vulnerable it was to increases in short-term interest rates, which would both decrease the net interest income and force the Company to immediately recognize losses.

In addition to the reduced yield and immediate recognition of losses, increases in the interest rate affect the overall value of mortgage-backed securities, as explained in <u>Olkey v. Hyperion 1999 Term Trust, Inc.</u>, 98 F.3d 2, 10 n.1 (2d Cir. 1996) (Newman, C. J., dissenting):

> Normally, the value of mortgage-backed securities decrease when interest rates increase, and rise when interest rates decline. These effects are enhanced by the change in the rate at which mortgagors elect to pay off their mortgages. When interest rates rise, the pay-off rate declines, and holders of mortgage-backed securities have, in effect, lengthened maturities on average and thereby reduced value. When interest rates decline, the mortgage pay-off rate rises, and holders of mortgage-backed securities have, in effect, shortened maturities on average, received back principal sooner than anticipated, and thereby enhanced value.

<u>Id.</u>

The Complaint alleges NYCB discretely diverted an increasing portion of its capital from conservative, interest-rate neutral, lending activities, to the more risky investment of the carry trade in order to generate continued earnings growth. This purportedly was accomplished by advertising the company as a conservative community bank that was one of the few financial institutions that was well-protected against interest rate increases due to its conservatively written multi-family loans. In particular, the Plaintiffs allege that the Defendants: (1) falsely represented that NYCB was uniquely able to thrive in an environment of rising interest rates and that its business prospects remained strong; (2) highlighted a false strategy of deleveraging following the acquisition of Roslyn; and (3) failed to adequately disclose the extent of

the risks of the carry trade activity. These alleged material misrepresentations or omissions set forth in the Complaint are fleshed out in greater detail below.

First, as to the claim that the Defendants highlighted the purported safety of NYCB's investment portfolio. This allegedly was accomplished by the Defendants statements regarding the company's ability to withstand rising interest rates and its conservative stance. For example, defendant Joseph R. Ficalora, the Chief Executive Officer, President and a Director of NYCB, emphasized that NYCB was not vulnerable to increases in interest rates in response to media inquiries:

> So, you're actually going to be doing better in a rising interest environment?
>
> That's right. … So with the rising interest rate environment, since [] the securities portfolio was structured to re-price, no matter whether rates were going up or not, it automatically will give us significantly more assets, at better yields [than] were contemplated in the [Roslyn] deal.
>
> * * *
>
> As we sit today, our assets are probably the most risk adverse assets that are out there in the marketplace.

Compl. ¶ 110 (quoting an October 22, 2003 interview with Bloomberg).

> Ficalora also described the state of the bank to analysts as follows:
>
> [The balance sheet's] current configuration reflects the investment of borrowed funds into two to three year assets with characteristics that support our aversion to both interest rate and extension risk.
>
> In a recent interview I was asked what I consider to be our greatest characteristic, and I believe that my response was perhaps our [aversion]

to risk. This trait is not only reflected in the quality of our assets, it is reflected in virtually every management decision we make.

Compl. ¶ 111 (quoting an October 22, 2003 conference call with analysts).

At the time of the January 2004 offering the defendant Ficalora continued to represent to the investing public through analysts that NYCB remained risk-averse:

[W]e are confident in our ability to manage our balance sheet regardless of changes in interest rates and changes in our market. And [] we are confident in our ability to manage interest rate risk.

* * *

I'd say that interest rate sensitivity, we're neutral on that.

Compl. ¶¶ 135, 136 (quoting a January 27, 2004 analysts conference call); see also Compl. ¶ 140 ("We are a risk adverse company. We have always been a risk averse company. We have sacrificed earnings.") (quoting a January 28, 2004 speech at a Smith Barney conference)).

The Complaint also alleges that the Defendants made false or misleading statements regarding the growth of the bank's customer deposits and whether those deposits had an adverse impact on the company's financial performance. During a conference call with securities analysts on January 24, 2004, Ficalora stated there had not been any attrition in the deposits, and that he expected them to grow. However, according to several former employees of NYCB, including an Assistant Supervisor

and a Vice-President for Investments, there was significant deposit attrition occurring at Roslyn branches prior to the merger.

In late February 2004, defendant Ficalora made additional representations concerning the Company's risk aversion, while at the same time NYCB was releveraging its balance sheet and investing heavily in mortgage-backed securities. Nevertheless, the Defendants allegedly continued to represent to investors that NYCB was pursuing, and would continue to pursue, a risk-averse investing policy, stick to its core business, and reduce its exposure to credit and interest rate risk. Compl. ¶¶ 71, 153.

Second, the Plaintiffs claim that the Defendants falsely stated that NYCB would pursue a strategy of deleveraging following the acquisition of Roslyn. At the time the Roslyn Merger was announced, NYCB had stated that it would dispose of $3.5 billion of securities as part of its plan to restructure the combined entity's balance sheet to make it less vulnerable to increases in short-term rates. Compl. ¶ 65. The deleveraging plans were stated on September 23, 2003 when NYCB filed with the SEC its Pre-Effective Amendment No. 3 to its Registration Statement to register the 64 million shares of NYCB common stock offered in exchange for Roslyn stock to effectuate the Roslyn Merger. The Plaintiffs claim that this statement contained several misrepresentations, namely, (1) information concerning NYCB's restructuring plan; (2) the downsizing of the securities portfolio; (3) the purported benefits of the

merger; and (4) the projected effect of the merger on NYCB's earnings for 2004. Compl. ¶¶ 103–07. The Plaintiffs allege that the Defendants knew and did not disclose in the statement that NYCB could not meet its 2004 earnings forecasts if it remained deleveraged as planned for any meaningful amount of time. Compl. ¶ 85.

At year end 2003, NYCB reported that it had deleveraged $2.3 billion of securities, consistent with its stated plan at the time of the Roslyn Merger of lowering the size of its mortgage-backed securities portfolio to $7.5 billion. Commensurate with this sell off, NYCB also disclosed that its increasing investment in the carry trade had resulted in an increase in its net interest income by $84 million in the fourth quarter of 2003. Compl. ¶69; see, e.g., ¶¶68, 123 ("While the production of multi-family mortgage loans has been our primary post-merger focus, the repositioning of our securities portfolio has also been an important focal point. Securities totaled $9.5 billion at the end of December, representing a $2.3 billion reduction since the Roslyn merger was announced.").

In January 2004, NYCB issued 10 million shares of its common stock in a secondary public offering (the "January 2004 offering"). The January 2004 offering raised $400 million. Compl. ¶126. Defendants publicly stated that the $400 million would be used for, among other things, "a variety of general corporate purposes." The registration statement filed to effectuate this offering stated that, "our primary focus

shifted in connection with the Roslyn Bancorp merger announcement to a strategy of balance sheet repositioning." Compl. ¶131.

After the January 2004 offering, the Defendants, through the "carry trade" described above, leveraged hundreds of millions of dollars in order to purchase billions of dollars of mortgage-backed securities. Compl. ¶152. The Plaintiffs claim that the Registration Statement for the offering unlawfully failed to state, among other things, that the proceeds would be used to leverage NYCB's risky carry trade activities. Compl. ¶¶ 126-33.

Finally, the Plaintiffs claim that NYCB utilized an undisclosed "internal earnings model" to assess the risks of increasing interest rates on the Company's net interest income. Compl. ¶169. As part of its management process, NYCB regularly used an interest rate sensitivity analysis. The Company explained in its June 2003 10-Q that it examined the extent to which its assets and liabilities were "interest rate sensitive" and monitored the bank's interest rate sensitivity "gap." Compl. ¶ 55. In addition, NYCB conducted a Net Portfolio Value (NPV) analysis at the end of each quarter to assess the impact of potential changes in interest rates on the Company's net worth. ¶56. Pursuant to such models, NYCB made what the Complaint describes as generalized disclosures concerning its gap and NPV analyses. In addition, the Complaint claims that NYCB did not reveal until May 10, 2004 in its Form 10-Q that it also used an "internal earnings model" that "incorporates market-based assumptions

regarding the impact of changing interest rates on future levels of financial assets and liabilities." Compl. ¶ 169. As the Company stated, "the earnings model, when coupled with traditional gap analysis, is an effective tool, one that enables the Company to maintain a stable net interest margin, utilize capital in an effective and risk-averse manner, and to maintain adequate liquidity." Compl. ¶ 169. Although NYCB acknowledged that this methodology was critical to any analysis of interest rate sensitivity, NYCB did not disclose the results of its analyses using this methodology until very late in the Class Period.

The Plaintiffs claim that such nondisclosure is actionable under the securities laws. The Plaintiffs assert that this model provided the investing public with the concrete data that the Defendants had known concerning the impact of rising interest rates on NYCB's investment portfolio. Compl. ¶ 169. Specifically, the Plaintiffs claim that the disclosure revealed that, based upon the then current composition of NYCB's securities portfolio, if interest rates were to rise by 200 basis points (2%), the company's net interest income for the following twelve months would be lower by almost 8%. ¶ 169.

On July 1, 2004, at the end of the Class Period, the Defendants made additional statements that the Plaintiffs allege contradicted their former position that NYCB was a risk-averse company capable of withstanding increases in interest rates. The company issued a press release revealing that the it was restructuring by

"extend[ing] its liabilities to improve interest rate risk profile."  To that end, the Company sold $5.0 billion of securities in its portfolio in an attempt to significantly reduce its exposure to rising interest rates, resulting in an immediate $95 million charge, or $0.35 per diluted share, in the second quarter 2004.  Moreover, NYCB slashed its guidance for 2004 earnings by approximately one-third to $1.42 to $1.47 per diluted shares from its previous forecast of $2.17 to $2.20.

With regard to scienter, the Plaintiffs claim that the Defendants' had a conscious or reckless disregard of the foregoing allegations, and that they had numerous motives for concealing the true state of NYCB's affairs from the investing public.  These motive included both the desire to complete the stock-for-stock Roslyn Merger and the January 2004 offering, and attempts to make NYCB a more attractive for acquisition by a larger financial institution.  Specifically, the Plaintiffs claim that NYCB releveraged its case from the January 2004 offering into the carry trade to create the appearance of earnings growth and to make the company more attractive to potential merger partners.  The Complaint alleges that NYCB also undertook additional efforts to position itself as a more attractive suitor by laying off employees and selling bank branches.

Further, during the Class Period the Plaintiffs claim that the Defendants engaged in a scheme to deceive the market by issuing false and misleading statements and that these as a result the stock price of NYCB was artificially inflated.  When the

Defendants' omission of material information in connection with its investment strategy and loan portfolio were disclosed to the market, the price of NYCB common stock fell, and caused the Class to suffer economic damages under the securities laws.

As for loss, the Complaint states that NYCB stock traded at an artificially inflated level throughout the Class Period, reaching as high as $35.12 per share on February 27, 2004. On April 21, 2004, after the disclosure of the size of NYCB's securities portfolio and the releveraging of its balance sheet, the price of common stock fell 9% to $26.28. Further, on May 10, 2004, after it was disclosed that NYCB was seeking strategic alternatives such as merger with other institutions, NYCB's common stock declined approximately 5.5% falling to $22.50 per share. In reaction to the July 1, 2004 press release regarding the company's restructuring , the price of NYCB stock fell as much as $1.36, or 7.1%, from its closing price of $18.98 on July 1, 2004, to as low as $17.62 on July 2, 2004.

## II.  DISCUSSION

### A.        The Motion for Reconsideration

The Tawil Plaintiffs seek an order vacating the Order of Consolidation dated August 9, 2005, and reinstating their motion to remand that was filed on February 28, 2005. The Tawil Plaintiffs originally commenced their action in the Supreme Court, Kings County, alleging violations of the Securities Act. On November 24, 2004, the Defendants filed a Notice of Removal under 28 U.S.C. § 1446(d). After removal, the

Tawil Plaintiffs filed their motion to remand, arguing that the action was improperly removed under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), which prohibits removal of cases based exclusively on the Securities Act.

On August 9, 2005, Judge Hurley issued his decision to consolidate the eleven related purported securities class actions commenced on behalf of investors who purchased or acquired stock of NYCB that were pending in the Eastern District of New York. The Court did not specifically address the Tawil Plaintiffs' motion to remand, but it noted that the Tawil action was part of the Court's consolidation order, and also ordered the ten pending cases be closed and consolidated into the first filed action, number 04 CV 4165, by the filing of an amended complaint. This Order was entered on the docket on August 10, 2005, and the case was marked "Consolidated" and "Civil Case Terminated" on the electronic docket.

On February 24, 2006, an administrative docket entry was posted by the Clerk of the Court terminating the pending motion to remand. On April 12, 2006, the Tawil Plaintiffs filed this motion to vacate the Order of Consolidation. The Tawil Plaintiffs argue that they had no notice of a pending motion to consolidate; that the Order of Consolidation did not dispose of their pending motion to remand; and that the termination of the motion on the docket was a clerical error.

The Tawil Plaintiffs' claim that their action was improperly removed has merit. Although courts have differed in their interpretations, the provisions of SLUSA

appear to expressly prohibit removing claims based solely on the Securities Act from state to federal court.  See Irra v. Lazard Ltd., No. 05 CV 3388 RJDRML, 2006 WL 2375472, at *1(E.D.N.Y. Aug. 15, 2006).  However, that is not the compelling issue with regard to this motion.

The significant issue in this motion to vacate is whether the Order of Consolidation had any legal consequence to the pending motion to remand.  The Tawil Plaintiffs position that the Order of Consolidation did not terminate their motion to remand strains credulity.  Consolidating stockholders' class suits and directing that a superseding amended complaint be filed may seriously prejudice certain plaintiffs, and may be redressed by the filing of an appeal or a writ of mandamus.  See In re Repetitive Stress Injury Litig., 11 F.3d 368, 373 (2d Cir. 1993); Garber v. Randell, 477 F.2d 711, 716 (2d Cir. 1973); Johnson v. Manhattan Ry. Co., 289 U.S. 479, 496–497, 53 S. Ct. 721, 727–728, 77 L. Ed. 1331 (1933).

Here, the Order of Consolidation clearly prejudiced the Tawil Plaintiffs' position.  The order expressly stated that the eleven pending actions were consolidated into the first filed case and directed the Clerk to close and terminate the other ten actions.  The order also directed the filing of a consolidated amended complaint, which once filed would extinguish the Tawil Plaintiffs' argument that their complaint only asserts claims under the Securities Act.  The Consolidated Amended Complaint

that was filed asserted both claims under the Securities Act and the Exchange Act, effectively mooting the Tawil Plaintiffs' only argument in support of remand.

Under the particular circumstance of this case, the Tawil Plaintiffs' assertion that they had no notice of the motion to consolidate is not relevant to the inquiry. Under Fed. R. Civ. P. 42, a court may consolidate related actions on its own, without a motion from a party. Devlin v. Transp. Communications Int'l Union, 175 F.3d 121, 130 (2d Cir.1999). Further, it is undisputed that the Tawil Plaintiffs had notice of the entry of the Order of Consolidation and the Consolidated Amended Complaint. The Tawil Plaintiffs had ample opportunity at the time the Order of Consolidation was entered to either seek reconsideration or immediately appeal from the adverse decision. Nevertheless, the Tawil Plaintiffs waited more than seven months after the Order of Consolidation was entered and more than four months after the Consolidated Amended Complaint was filed to seek relief from the Court. E.D.N.Y. Local Rule 6.3 requires that a motion for reconsideration or re-argument of a court order determining a motion be served within ten days after the entry of the court's order. Having failed to timely seek re-argument or appeal of the Order of Consolidation, the Tawil Plaintiffs motion to vacate the Order of Consolidation is denied.

**B.     The Motion to Dismiss**

**1.     The Standard of Review**

In a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court may only dismiss the complaint if it appears beyond doubt that the plaintiffs can prove no set of facts in support of his complaint which would entitle him to relief. See King v. Simpson, 189 F.3d 284, 286 (2d Cir. 1999); Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991) (holding that dismissal is inappropriate unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations").  The issue to consider is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims. See Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995). Indeed, it is not the court's function to weigh the evidence that might be presented at trial, rather the court must merely determine whether the complaint itself is legally sufficient.  See Villager Pond, 56 F.3d at 378.  The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  See Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 165 (2d Cir. 2005); DeMuria v. Hawkes, 328 F.3d 704, 706 (2d Cir. 2003); Koppel v. 4987 Corp., 167 F.3d 125, 127 (2d Cir. 1999); Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir. 1998).

In making this decision, the court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999); see Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000) (holding that for the purpose of deciding a motion to dismiss, the complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999). The Court also may consider documents that the plaintiff either possessed or knew about and upon which he relied in bringing the suit. Rothman, 220 F.3d at 97; Cortec Industries, Inc. v. Sum Holding, L.P., 949 F.2d 42, 47–48 (2d Cir. 1991). Further, in securities fraud actions, the Court may consider documents that are required to be filed, and actually have been filed with the SEC. Rothman, 220 F.3d at 89 (citing Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 808–09 (2d Cir. 1996). However, "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." Faulkner v. Beer, No. 05-1568-CV, 2006 WL 2588014, at *3 (2d Cir. Sept. 8, 2006).

Rule 9(b) of the Federal Rules of Civil Procedure sets forth additional pleading requirements with respect to the allegations of fraud. In particular, Rule 9(b) requires

that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). In securities fraud actions, the requirements of Rule 9(b) are applied "assiduously." Lentell, 396 F.3d at 168; see Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127 (2d Cir. 1994). In addition, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") heightened Rule 9(b)'s requirement for pleading scienter. See 15 U.S.C. § 78u-4(b)(3)(A); see also Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 537-38 (2d Cir. 1999). As a result, in securities fraud actions, scienter may not be averred generally. Rather, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Press, 166 F.3d at 538 (quoting 15 U.S.C. § 78u-4(b)(3)(A)); see also Chill v. General Elec. Co., 101 F.3d 263, 268–69 (2d Cir. 1996).

### 2. The Federal Securities Laws

The Plaintiffs allege claims under sections 10(b), 20(a), 14(a), and 14(e) of the Exchange Act, and sections 11, 12(a)(2), and 15 of the Securities Act. Each of these provisions of the federal securities laws have somewhat different elements, but all of them share the common requirement that the plaintiff identify "a materially misleading statement made by the defendant." Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 57–58 (2d Cir. 1996); I. Meyer Pincus, 936 F.2d at 761. To state a claim for relief under Section 10(b) and Rule 10b-5 of the Exchange Act, the plaintiffs

must allege that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell, 396 F.3d at 172 (quoting In re IBM Secs. Litig., 163 F.3d 102, 106 (2d Cir. 1998)). Section 14(e) of the Exchange Act prohibits any person from making a materially false and misleading statement or omission in connection with any tender offer. Billard v. Rockwell Intern. Corp., 683 F.2d 51, 53 (2d Cir. 1982); 15 U.S.C. s 78n(e). Section 14(a) and Rule 14a-9 of the Exchange Act bars the dissemination of proxy statements that are "false or misleading with respect to any material fact." 17 C.F.R. § 240.14a-9(a); see 15 U.S.C. § 78n(a); Schiller v. Tower Semiconductor Ltd., 449 F.3d 286, 290 (2d Cir. 2006).

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, creates a cause of action when any part of a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Lasker, 85 F.3d at 57–58. Section 12(a)(2) of the Securities Act "imposes liability on any person who offers or sells securities by means of a prospectus containing material misstatements." Yung v. Lee, 432 F.3d 142, 147 (2d. Cir.2005). Finally, claims under Section 20(a) of the Exchange Act, and Section 15 of the Securities Act are necessarily predicated on a

primary violation of securities law and impose "control person" liability on individual defendants.  <u>Rombach v. Chang</u>, 355 F.3d 164, 177–78 (2d Cir. 2004).

### 3. Materiality

The Supreme Court set forth the applicable materiality standard under section 10(b) and Rule 10b-5 in <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988), stating, "to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " <u>Id.</u> at 231–32, 108 S. Ct. 978,  99 L. Ed. 2d 194 (quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)).

Similarly, the materiality standard under Section 14(a) and Rule 14a-9 of the Exchange Act pertaining to proxy statements hinges on whether "a reasonable shareholder would consider it important in deciding how to vote." <u>Virginia Bankshares, Inc. v. Sandberg</u>, 501 U.S. 1083, 1090, 111 S. Ct. 2749, 115 L. Ed.2d 929 (1991); <u>TSC Indus.</u>, 426 U.S. at 445, 96 S. Ct. 2126, 48 L. Ed. 2d 757); <u>Resnik v. Swartz</u>, 303 F.3d 147, 151 (2d Cir. 2002).  Further, this same materiality standard applies to Section 14(e) claims concerning tender offers, <u>see</u> <u>Schreiber v. Burlington Northern, Inc.</u>, 472 U.S. 1, 11, 105 S. Ct. 2458, 2464, 86 L. Ed. 2d 1 (1985), and sections §§ 11 and 12(2) of the Securities Act, <u>see</u> <u>Geiger v. Solomon-Page Group,</u>

Ltd., 933 F. Supp. 1180, 1184 (S.D.N.Y. 1996).  Accordingly, at the pleading stage, the plaintiff satisfies the materiality requirement "by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 329 (2d Cir. 2002).

In the motion to dismiss, the Defendants argue that the Plaintiffs have not pled any material misstatement or omission actionable under the federal securities laws, an element common to all of the causes of action in the Complaint.  The Plaintiffs' Complaint alleges numerous false or misleading statements in press releases, SEC filings, newspaper articles, analyst conference and interviews, but the Plaintiffs' opposition to the motion groups these statements in three categories: (1) the vulnerability of NYCB to rising interest rates, Compl. ¶¶ 68, 110, 111, 117, 135, 136, 140; (2) the strategy of NYCB to deleverage following the Roslyn merger, Compl. ¶¶ 84, 109, 116, 123, 131; and (3) the customer deposits and their impact on financial performance, Compl. ¶ 139.  The Court will address each category separately.

### i.    The Vulnerability to Rising Interest Rates

The Complaint alleges that the Defendant Ficalora continually made statements during the Class Period that NYCB was "interest rate neutral," Compl. ¶ 68, 136, and that it would experience "significantly better earnings" if interest rates continued to rise because the company was primarily a multi-family lender that

continually refinances. Compl. ¶ 110. In addition, Ficalora stated that NYCB's greatest asset was that it is risk-averse and that strategy permeates every decision the company makes. Compl. ¶ 111, 117. This culminated on January 27, 2004, when Ficalora reflected on the company's success in 2003 and raised the 2004 earnings estimates, basing this adjustment on the company's ability to originate loans in a competitive market and manage the balance sheet regardless of rising interest rates, without stating that the successes in 2003 were largely attributed to the successful leveraged growth in the carry trade.

These alleged misstatements all constitute generalizations regarding integrity, fiscal discipline, and risk management, that amount to no more than inactionable puffery. Lasker, 85 F.3d at 59; In re JP Morgan Chase Secs. Litig., 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005); In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 413 n. 15 (S.D.N.Y. 1998) (finding that statements relating to defendants' strategic planning were puffery.); see also In re Salomon Inc. Sec. Litig., No. 91 Civ. 5442, 1994 WL 265917, at *9 (S.D.N.Y. June 16, 1994). No reasonable investor would not have relied on such statements if they had examined the numerous disclosures NYCB made regarding the magnitude of its investment in mortgage-backed securities and the risk associated with such investments.

"An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." Brown v. E.F.

Hutton Group, Inc., 991 F.2d 1020, 1032 (2d Cir. 1993). Here, it is apparent from the quarterly reports disclosed to the public that the company was heavily involved in investing in mortgage-backed securities. See, e.g., NYCB 3Q 2003 Form 10-Q at 2. In addition, the risks associated with such practice were highlighted in the January 2004 offering prospectus, see 2004 Offering Prospectus at S-5, which was perhaps the most important document and primary resource that the Plaintiffs should have consulted in seeking information regarding the shares. See id.

The Second Circuit's decision in Hunt v. Alliance North Am. Gov't Income Trust, Inc., 159 F.3d 723, 730 (2d Cir. 1998), is instructive on the disclosures required for such risky investments. In that case the complaint alleged that a prospectus failed to disclose that the defendant would invest in interest rate sensitive mortgage-backed securities. In affirming the dismissal of that claim, the court noted that the prospectus stated that the fund would invest in such securities and it had an "extensive description" of the mortgage-related instruments. This description included the cautionary language that "it is not possible to predict accurately the realized yield" and that the instruments "may involve additional risk of loss of principal . . . ." Id. at 731.

The Defendants made similar cautionary disclosures regarding mortgage-backed securities. The 2003 Form 10-K plainly disclosed that the company had 5.5 billion invested in mortgage-backed securities and that the company was increasing its

borrowing to capitalize on the leveraged growth strategy.  As a result, the"Company's

primary market risk lies in its exposure to interest rate volatility."  NYCB 2003 Form

10-K at 20–21.  In the 2004 Offering Prospectus Supplement, the NYCB disclosed

that "Rising interest rates may reduce our net income and future cash flows."  The

disclosure explained:

> Our income and cash flows are affected by changes in interest rates, over which we have no control.  Our primary source of income is our net interest income, which is the difference between the interest income earned on our interest-earning assets and the interest expense incurred on our interest-bearing liabilities.

2004 Offering Prospectus at S-5.

The disclosure also provided two methods that the company used to monitor

interest rate sensitivity.  One, the "interest rate sensitivity gap," simply calculated the

difference between the interest rate sensitive assets and liabilities maturing or

repricing within one year.  NYCB frankly disclosed that its sensitivity gap on

September 23, 2003 was negative 21.18%.  The prospectus then explained that "[i]n a

rising interest rate environment, an institution with a negative gap would generally be

expected, absent the effect of other factors, to experience a greater increase in its cost

of liabilities relative to its yield on assets, and thus decrease in its net interest income."

January 2004 offering Prospectus at S-5.  The second method, the net portfolio value

("NPV"), monitored the company's overall sensitivity to changes in interest rates.

This disclosure estimated that an interest rate reduction of 200 basis points would reduce the expected cash flow by 14.27%.

The combined effect of these two disclosures is telling. Boiled down, the company revealed that (1) its primary source of income is interest; (2) current estimates projected that liabilities will rise and interest income will decrease; and (3) if interest rates decline by 200 basis points, cash flow will be reduced by 14.27%. "Defendants were not obligated to describe in pejorative terms the types of mortgage-backed securities in which the [thrift] invested." Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 175 (S.D.N.Y. 1996); see In re Donald J. Trump Casino Secs. Litig., 7 F.3d 357, 375 (3d Cir.1993)

In this light, the oral statements made by Individual Defendants concerning the company's risk-aversion to interest rate increases were permissible. Generalized statements regarding a company's fiscal discipline and risk management amount to no more than inactionable puffery. In re JP Morgan Chase, 363 F.Supp.2d at 633. Further, such oral representations are immaterial, where, as here, they are "contradicted by plain and prominently displayed language in the prospectuses." Olkey, 98 F.3d at 9 (citing Dodds v. Cigna Secs., Inc., 12 F.3d 346, 351 (2d Cir. 1993). The Second Circuit recognizes that " 'up to a point, companies must be permitted to operate with a hopeful outlook,' and that as a result, executives 'are not required to take a gloomy, fearful or defeatist view of the future.' " In re Nokia Oyj

(Nokia Corp.) Secs. Litig., 423 F. Supp.2d 364, 397–98 (S.D.N.Y. 2006) (quoting

Rombach, 355 F.3d at 174); see also In re QLT Inc. Secs. Litig., 312 F. Supp. 2d 526,

532 (S.D.N.Y.2004) ("The PSLRA deems generalized expressions of corporate

optimism immaterial as a matter of law and therefore insufficient as the basis for an

action alleging securities fraud."); In re Duane Reade Inc. Sec. Litig., 2003 WL

22801416, at *4 (holding that an actionable statement "must be one of existing fact,

and not merely an expression of opinion, expectation or declaration of intention.").

Moreover, "[a] company has no duty to disparage its own competitive position

in the market where it has provided accurate hard data from which analysts and

investors can draw their own conclusions about the company's condition and the value

of its stock." In re Donna Karan Intern. Secs. Litig., No 97-2011, 1998 WL 637547,

at *13 (E.D.N.Y. Aug. 14, 1998) (quoting In re Syntex Corp. Secs. Litig., Civil No.

92-20548 SW, 1993 WL 476646, at 7 (N.D. Cal. Sept. 1, 1993). Thus, Ficalora's

statements that NYCB could withstand an interest rate increase, and that it was a risk-

averse institution—due to its large investment in multi-family lending—were not

material to the "total mix" of the information available to investors.

Likewise, the Defendants were under no obligation to disclose the use and

results of a third internal analyses regarding NYCB's exposure to future changes in

interest rates. "Such internal calculations and projections are not material facts that are

required to be disclosed." Sheppard, 938 F. Supp. at 177–78. "[A] corporation is not

required to disclose a fact merely because a reasonable investor would very much like to know that fact." In re Time Warner Inc. Secs. Litig., 9 F.3d 259, 267 (2d Cir. 1993). "The federal securities laws do not obligate companies to disclose their internal forecasts." In re Northern Telecom Ltd. Secs. Litig., 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) (quoting In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1427 (3d Cir.1997); see also In re Convergent Techs. Secs. Litig., 948 F.2d 507, 516 (9th Cir.1991) (explaining that a company is generally "not obliged to disclose [its] internal projections"); In re Ivan F. Boesky Secs. Litig., 825 F. Supp. 623, 635 (S.D.N.Y. 1993) (explaining that "corporations and their management are under no general duty to disclose").

### ii.    Deleveraging after the Roslyn Merger

The Complaint alleges that the Defendants made misrepresentations that they would stabilize the company by decreasing their leveraging activities following the Roslyn Merger, and that such representations were false and misleading because NYCB needed to materially increase the size of its securities portfolio in order to generate earnings to support its 2004 forecasts. The Defendants admit that they announced the intention to restructure Roslyn's balance sheet following the merger of the two banks by selling off a large portion of its securities. However, they argue that this stated strategy in no way suggested that NYCB would abandon its long

established "leveraged growth strategy," which included borrowing to invest in mortgage-backed securities.

Indeed, an analysis of the company's disclosures reveals that, it stated that it would pursue both strategies for a period of time. In the 2003 10-K, the Defendants stated: "Reflecting management's stated preference for multi-family lending, it is expected that the Company's portfolios of securities and mortgage-backed and - related securities will be reduced over time. The Company intends to invest the cash flows generated by securities sales and repayments into multi-family and other higher yielding loan originations, depending on market conditions and other investment opportunities." 2003 10-K at 20. In January 2004, NYCB announced that it had, as predicted, sold 2.5 billion of Roslyn securities. By July 1, 2004, the NYCB sold another $5 billion of securities in its portfolio.

However, between January 2004 and July 2004, during the first quarter, NYCB reinvested and leveraged heavily into the mortgage-backed securities market by raising its securities profile by 3.8 billion to 12.1 billion. NYCB argues that this investment was consistent with its disclosed strategy of leveraged growth disclosed in each of its reports for the prior three years. The Court agrees. An examination of the public reports prior to and during the Class Period reveals that NYCB consistently disclosed the company's "leveraged growth" strategy of investing in mortgage-backed securities. See NYCB 3Q 2001 Form 10-Q at 20 ("It is management's expectation

that the Company's net interest income, interest rate spread, and net interest margin will continue to benefit from the steepening of the yield curve."); NYCB 2002 Form 10-K at 14 ("[T]he Company also pursued a profitable leveraged growth strategy."); NYCB 2Q 2003 Form 10-Q at 9–10 ("Reflecting this leveraged growth strategy . . . the portfolio of securities available for sale rose $324.5 million to $4.3 billion."); NYCB 2003 Form 10-K at 4 ("[T]he Company focused on a strategy of leveraged growth in 2003."); NYCB 1Q 2004 Form 10-Q at 14 ("Borrowed funds totaled $12.7 billion at March 31, 2004, up $2.7 billion, or 27.7%, from the year-end 2003 balance; the interest reflects the Company's leveraged growth strategy.")

"Plaintiffs cannot now claim they were unaware of the 'real' investment plan when that plan was based on disclosed facts." In re Hyperion Secs. Litig., No. 93-7179, 1995 WL 422480, at *6 (S.D.N.Y. July 14, 1995), aff'd, Olkey, 98 F.3d at 2. NYCB's stated intentions regarding deleveraging "simply reflected company policy at the time; they were not promis[ing] to maintain that policy in the future, and thus were not rendered misleading by the company's subsequent consideration of an alternative plan." San Leandro, 75 F.3d at 811.

The totality of the public disclosures from NYCB portray an overall commitment to deleverage over the long-term, while taking advantage of opportunities for leveraged growth when and if they were presented. It is unclear how the Defendants deviated from this stated course. Nowhere in the Complaint do the

Plaintiff allege that NYCB ever misstated any historical fact or even one item of financial data. Indeed, the re-leveraging in the first quarter was completely reported as soon as disclosure was required, and the Plaintiffs do not claim that disclosure should have been made sooner. NYCB's investment activities were completely transparent, fully disclosed, and readily available for any investor that made even the most cursory inquiry. Accordingly, contrary to the Plaintiffs' allegations, the Court finds that NYCB took no change in course during the first quarter of 2004 regarding leveraging. The company's investments were entirely consistent with its prior statements, and certainly not materially misleading under the securities laws.

The Plaintiffs also argue that the January 2004 offering materially mislead investors by stating that the company intended to use the proceeds of the offerings for, among other things, "general corporate purposes," and "to finance multi-family loan originations and potential acquisitions of banking branches, other financial institutions and other financial services companies." Jan. 2004 Offering Supp. Prospectus at S-8. While it is true that the prospectus does not specifically state that the company was going to use the funds as leverage for investing an additional 3.8 billion in the securities portfolio, such specificity was not required. As explained in In re WorldCom, Inc. Secs. Litig., 346 F. Supp. 2d 628, 696–97 (S.D.N.Y. 2004), Item 504 of Regulation S-K only requires that a registration statement disclose the "principal purposes for which the net proceeds to the registrant from the securities to be offered

are intended to be used and the approximate amount intended to be used for each such purpose." Id. (quoting 17 C.F.R. § 229.504). If the company states that the funds will be used for "general corporate purposes," the term is broad enough to encompass a number of different items. Id. (finding that the term is broad enough to cover the funding of "negative cash flow"). A company does not mislead investors by using this broad term, as long as the funds are allocated to one of the company's ongoing operations and the Registration Statement adequately discloses all the material information about the risks involved in investing in such an activity. Id.; see also DeMaria, 153 F. Supp. 2d 300, 313 (S.D.N.Y. 2001), aff'd, 318 F.3d 170 (2d Cir. 2003).

In this case, it is clear that NYCB was not only in the business of investing in mortgage-backed securities, but that it was a mainstay of the company's earnings. The Prospectus stated that NYCB's "general corporate purposes" included, among other things, "funding investments." 2004 Offering Prospectus at 9. The Prospectus disclosed that the company had $5.5 billion invested in mortgage-backed securities; that these investments had increased in the prior year through "leveraged growth;" and that borrowing through money repurchase agreements had increased. 2004 Offering Supp. Prospectus at S-14–15, S-19. In addition, the risks involved in such activity were, as noted above, adequately disclosed in the January 2004 offering and the company's other public statements. Accordingly, no reasonable investor could have

been mislead when NYCB used the funds of the offering for one of its corporate

purposes, that is, its leveraged growth strategy of capitalizing on the yield curve by

investing in mortgage-backed securities.  The Court finds that the disclosure that the

proceeds would be used for "general corporate purposes" was broad enough to include

the investment activity described as the "carry trade" in the Complaint.  There was no

material misrepresentation about the use of proceeds, and Item 504 does not require

disclosure of details.

### iii.     The Financial Performance of Customer Deposits

The Complaint alleges that the Defendants' representations regarding customer

deposit attrition and customer losses were false and misleading.  According to the

Complaint, four former employees of NYCB, stated that there was significant deposit

attrition occurring at Roslyn branches in anticipation of the merger, Compl. ¶¶ 89-91;

that company revenue would be adversely affected by large deposit attrition, and by

the fee increases on customer accounts and decreases in yields to be paid on deposit

accounts, Compl. ¶¶ 89-91; and that NYCB was planning on lowering yields earned

on customer deposit accounts and increasing service fees after the merger, which

would hinder Roslyn from remaining as a premier deposit accumulator in the future,

Compl. ¶91.  In support of these allegations, the Plaintiffs proffer quotes from

confidential sources only identified as an Assistant Supervisor and a Vice President of

Investments, that "millions of dollars, perhaps several hundred million dollars, were taken out of branches by Roslyn customers." Compl. ¶ 89.

The Defendants argue that there was no material misstatement because the public disclosures spelled out in precise detail the amount of deposits held during the Class Period and NYCB's business strategy of decreasing high-interest certificates of deposits ("CDs"). The Court agrees. An examination of the public disclosures reveals that prior to the merger Roslyn had $6.1 billion in total deposits, $3.4 billion of which were certificates of deposits, and after the merger those figures were reduced slightly to $5.9 billion in deposits and $3.2 billion in CDs. This was consistent with the company's stated intention prior to the merger of "attracting lower cost deposits and a parallel decline in higher cost depository accounts." NYCB 2Q 2003 Form 10-Q at 14. Further, after the merger the policy remained consistent, to "reduce its balance of CDs." NYCB 2003 10-K at 20.

Nearing the end of the Class Period, the results of NYCB's stated strategy was reported, as required under the securities laws. In accordance with disclosed plans, core deposits rose from $5.97 billion at the end of 2003, to $6.14 billion as of March 2004. NYCB 2003 10-K at 43; NYCB 1Q 2004 10-Q at 1, 14. Meanwhile, total CDs decreased from $4.36 billion to $3.89 billion, reflecting NYCB's plan to "see a continued rise in low-cost core deposits in tandem with a reduction in higher cost CDs." NYCB 1Q 2004 at 14.

Given these disclosures, no reasonable investor would have considered the alleged statements from the Plaintiffs' confidential sources regarding customer attrition significant in making decisions on whether to investment in NYCB.

In sum, the Court finds that the Plaintiffs have failed to allege any material misrepresentation of omission, an element common to all of the Plaintiffs claims. The disclosures made by NYCB prior to and during the Class Period in its quarterly and annual reports, as well as the January 2004 Offering Prospectus, show a company that was transparent. Any investor could have readily seen that NYCB was heavily leveraged, and deeply invested in risky mortgage-backed securities. Moreover, the risks associated with such investment activity were adequately disclosed to investors and shareholders. The Complaint does not identify one misstatement or omission regarding a historical fact or an item of financial data that is material under the federal securities laws. Accordingly, the Court finds that the Plaintiffs have failed to allege any actionable material misstatement or omission.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the motion by the Tawil Plaintiffs to vacate the Order of Consolidation is DENIED; and it is further

**ORDERED**, that the motion by the Defendants to dismiss the complaint for failure to state a claim is GRANTED; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
September18, 2006

_____
ARTHUR D. SPATT
United States District Judge